UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ROBERT D. ASHER,                    )
                                    )
            Plaintiff,              )
                                    )        Case No. 08-cv-4289
      v.                            )
                                    )        Judge John W. Darrah
J.P. MORGAN CHASE,                  )
                                    )
            Defendant.              )
                                    )

## MEMORANDUM OPINION AND ORDER

Plaintiff Robert D. Asher brings this action against Defendant JPMorgan Chase

Bank, N.A. ("JPMC") under the Age Discrimination in Employment Act of 1967

("ADEA"), 29 U.S.C. § 621, *et seq.*  Asher alleges JPMC discriminated against him on

the basis of his age when JPMC terminated him purportedly for attempting to forward

written confidential information to a client.  JPMC's motion for summary judgment on

Asher's sole claim is currently before the Court.  JPMC's motion is granted.

### BACKGROUND

The following facts are derived from the parties' filings required under Local

Rule 56.1.[1]  All facts are undisputed unless otherwise indicated.

---

[1] N.D. Ill. Local Rule 56.1(a)(3) requires the moving party to provide "a statement
of material facts as to which the moving party contends there is no genuine issue."  Local
Rule 56.1(b)(3) requires the non-moving party to admit or deny every factual statement
proffered by the moving party and to concisely designate any material facts that establish
a genuine dispute for trial.  *See Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 944
(7th Cir. 2005).

Robert D. Asher was employed by JPMC or its predecessors from 1995 until May 2007. (SOF ¶ 3.[2]) He was a senior portfolio manager in Private Client Services ("PCS"), a division of JPMC's Private Wealth Management Group. (*Id.* ¶ 14.) Asher was terminated on or about May 23, 2007. (*Id.* ¶ 3.) JPMC maintains Asher was terminated for forwarding information to a client in violation of JPMC's Code of Conduct. (*Id.* ¶ 76.) Asher claims it was because of his age. (*Id.* ¶ 4.) He was fifty-eight. (*Id.*)

As a senior portfolio manager, Asher managed stocks and other holdings in the portfolios of wealthy individuals and families. (*Id.* ¶ 14.) He reported directly to Laura Stone, Managing Director and Market Manager, and had a "dotted-line" reporting relationship with Karen Montgomery, Managing Director and Practice Leader. (*Id.* ¶¶ 15, 17.) At least some of Asher's accounts were "shared-authority" accounts, which means that in most cases, client consent would be required before Asher could make investment changes. (*Id.* ¶ 89.) Part of Asher's job thus involved communicating with clients about investments in their portfolios. (*See id.* ¶ 90.)

JPMC also employed a group of analysts who studied third-party mutual funds, bonds, and stocks. (*Id.* ¶ 24.) Although the parties disagree as to the characterization and purpose of the information the analysts provided, it is clear that such information was, in fact, provided to portfolio managers. (*See id.* ¶ 42.) Because JPMC is highly regulated,

---

[2] Pursuant to N.D. Local Rule 56.1, JPMC submitted a Statement of Facts containing eighty separately numbered paragraphs. Asher responded to JPMC's Statement of Facts and submitted forty additional separately numbered paragraphs (¶¶ 81-120) to which JPMC filed a separate response. The Court considers each

there is a risk that analyst information could be considered unlawful "pre-trade information" if provided to clients. (*Id.* ¶¶ 51-52.) For that reason, JPMC does not permit portfolio managers to send out analyst research or comments. (*Id.* ¶¶ 52, 54.)

During Asher's employment with JPMC, JPMC maintained a Code of Conduct, (the "Code"), which provided, in part:

> You may have access to confidential information related to the firm's business . . . . You may not, either during your period of service or thereafter, directly or indirectly use or disclose to anyone any such confidential information . . . . You should observe the following principles when dealing with information related to the firm's business: (a) Assume that most information you have about the firm and its business, or about its past, present, or prospective customers, suppliers, and employees, is confidential, unless the contrary is clear. . . . (d) Do not disclose confidential information to anyone outside the firm unless you are authorized to do so. . . . (i) Consult your manager or your compliance officer if you have any question about whether information can be shared.

(*Id.* ¶¶ 6, 8.) On March 19, 2007, Asher executed an electronic affirmation of receipt and understanding of the Code, agreeing to comply with the Code and supplemental policies applicable to him. (*Id.* ¶ 7.)

The Portfolio Management Group's internal website, to which Asher had access, contained information regarding what could be sent to clients. (*Id.* ¶ 9.) The Overview of Research Capabilities for PCS contained on that site specifies which information may be provided to clients and which information is for "Internal Use Only." (*Id.* ¶ 10.) The only item listed in the "For Client Use" column is "Baseline Report." (*Id.*

---

statement and response submitted by both parties but cites to the collective documents as "SOF ¶ __" for convenience.

¶ 12.) The column labeled "PCS-Internal Use Only" includes multiple items, including "JPM Analyst Commentary" and "PMG Research Analyst Commentary." (*Id.* ¶ 12.) JPMC's policies also stated, "Research reports from [JPMorgan Securities Inc.] should NEVER be provided to a PCS client." (*Id.* ¶ 11 (emphasis in original).) JPMC also had a Corrective Action Policy, which provided that corrective action "may be applied at the discretion of JPMorgan Chase and may begin at any time, with or without notice," that corrective action "may be taken for failure to follow the firm's policies, procedures, or practices," and that JPMC could take corrective action by immediately terminating an employee at any time without any prior warnings. (*Id.* ¶ 13.)

In May 2007, Asher attended a JPMC meeting and presentation regarding what information could and could not be given to clients. (*Id.* ¶¶ 38, 39.) The presentation provided that employees "[c]annot discuss target PM security selections before the trade has been executed in managed accounts" and "[c]an have broad conversations about [JPMorgan Securities, Inc.'s ("JPMSI")] capabilities but cannot discuss specific JPMSI investment products or recommendations." (*Id.* ¶ 39.) At that meeting, Asher asked whether he could disseminate research and was told "no." (*Id.* ¶ 40.) The parties disagree as to the specific question Asher asked. Asher maintains that his question was about "thesis research" only. (*Id.* ¶¶ 40-41.) JPMC contends that Asher asked if *any* research would be made available for clients and that the presenters informed him it would not. (*Id.* ¶¶ 40-41, 97.) Asher also states it was difficult to hear the presenters. (*Id.* ¶ 97.)

On May 10, 2007, Asher received an email from a JPMC analyst, which was sent to an internal JPMC email group that included Asher. (*Id.* ¶ 42.) The analyst's email contained her commentary regarding information she received at a public meeting affecting a certain pharmaceutical stock held by JPMC. (*Id.* ¶¶ 43-46.) The email did not contain any specific legend or disclaimer indicating it was confidential. (*Id.* ¶ 114.) Asher asserts the information in the email was not research and that it would have been obvious to non-laypersons (*id.* ¶¶ 44-47), but he does not dispute that statements in the email constitute analyst commentary and that JPMC considered analyst commentary to be proprietary and confidential (*id.* ¶¶ 45, 54).

On May 11, 2007, Asher attempted to forward the email to a client but was unsuccessful due to a typographical error in the address line. (*Id.* ¶ 58.) Asher did, however, send the email to the entire group that had initially received the analyst's email – he accidentally selected "reply all" instead of "forward." (*Id.*)

Immediately after he sent the email, Asher received several phone calls from management personnel, expressing concern about the email he sent. (*Id.* ¶¶ 60, 62.) Karen Montgomery learned about Asher's email mishap that same day when she received a chain of emails that included Asher's forward of the analyst's email. (*Id.* ¶ 68.) This chain also included an email from Andrew McGrade, which showed concern about the email Asher attempted to send:

> I have just spoken with Bob Asher, who is a Portfolio Manager in PCS' Chicago area. I've made it clear that his email below constituted alpha leakage and that all output from the [JPMorgan Asset Management] equity research team is strictly for internal purposes. He seemed not to have understood that [the analyst's] email was pure buyside

> research, but he understood the issues when I explained it.
> The need to safekeep your alpha has been previously
> communicated to all PCS Portfolio Managers and I will be
> sure that this is communicated again very clearly.

(*Id.* ¶ 69.) The chain also included an email from Joseph Kenney, National Head of the

Investment Business for PCS, stating, "Unbelievable. This was clearly addressed and

communicated in both sessions in Chicago last week." (*Id.* ¶ 70.)

On May 14, 2007, Montgomery forwarded the email chain to Stone (Asher's

direct supervisor), who in turn forwarded it to Steven Meriwise, Human Resources

Business Partner. (*Id.* ¶ 71.) With Meriwise's approval, and after discussing the matter

with two other managers, Stone and Montgomery decided to terminate Asher's

employment. (*Id.* ¶ 72.) Stone and Montgomery then held a meeting with Asher and

informed him that his employment was terminated because he forwarded the analyst's

email to a client in violation of the Code. (*Id.* ¶ 76.) JPMC did not hire anyone to

replace Asher after he was terminated; instead, the bulk of Asher's accounts were divided

between two other senior portfolio managers, Raymond Mau and Howard Hunt. (*Id.*

¶¶ 77, 118.) Prior to his termination, Asher had no disciplinary history and had been

rated well on past performance reviews. (*Id.* ¶¶ 85, 87, 88.)

Asher maintains he was terminated because of his age and that JPMC's actions

toward other employees support his case for discrimination. Two of these employees,

Raymond Mau and Howard Hunt, also were senior portfolio managers who, like Asher,

reported directly to Stone. (*Id.* ¶ 99.) Another JPMC employee, Christopher Flanagan,

worked as an assistant to portfolio managers Asher, Mau, and Hunt. (Asher Dep.

50:22-51:5.) Asher also discusses the departure of a former portfolio manager, Michael Stoffregen, who was terminated by JPMC in October 2006. (SOF ¶ 120.)

At the time of Asher's termination, Raymond Mau was a forty-one-year-old portfolio manager, who, like Asher, was directly supervised by Stone. (*Id.* ¶¶ 99-100.) Mau managed fewer assets than Asher and, in 2006, was ranked lower than Asher in terms of participating sales and in overall performance. (*See id.* ¶¶ 88, 101, 102.[3]) Mau has been a portfolio manager with JPMC since March 2000, and he is still with JPMC as a senior portfolio manager. (*Id.* ¶¶ 100, 102.)

At the time of Asher's termination, Howard Hunt was a fifty-seven-year-old portfolio manager. (*Id.* ¶¶ 20, 99.) Hunt's employment with JPMC ended on June 12, 2009, when Hunt was fifty-nine. (*Id.* ¶ 119.) The parties disagree as to the circumstances surrounding Hunt's departure from JPMC. Asher claims JPMC terminated Hunt purportedly because his department was being eliminated, while JPMC asserts that the Central Portfolio Management Group was consolidated to Columbus and that Hunt accepted a severance package in lieu of transferring. (*Id.*)

Christopher Flanagan was twenty-nine at the time of Asher's termination. (*See id.* ¶ 103.) He was employed by JPMC from February 2006 through December 2008. (*Id.*) The parties disagree as to Flanagan's job title and responsibilities. Asher characterizes Flanagan as a "portfolio manager," who "managed his own accounts,

---

[3] Although Asher characterizes Mau as having "a significantly smaller workload" than both Asher and Hunt, JPMC notes that no testimony supports that contention and that Flanagan, who assisted Mau, Asher, and Hunt, testified that the amount of assets Mau managed was roughly three-fifths to four-fifths the amounts managed by Asher and Hunt. (Def. Resp. to SOF ¶ 102.)

followed the J.P. Morgan model, and made his decisions with respect to the accounts he managed." (*Id.* ¶¶ 103-104.) JPMC, on the other hand, states that Flanagan was not a "portfolio manager" but a "portfolio manager assistant" or "portfolio specialist," who did not have his own accounts but executed sales or trades on behalf of the portfolio managers with whom he worked. (*Id.*) Regardless of his title, it is clear that Flanagan was in a position junior to that of Asher, Mau, and Hunt. (*See, e.g.*, Asher Dep. 50:22-51:5.)

Unlike Asher, Mau, and Hunt, Flanagan did not report directly to Stone. He reported to Beatrice Miller, who in turn reported to Stone. (SOF ¶ 99.) Flanagan did, however, discuss his career options with Stone and Montgomery, which Asher claims to be relevant to his allegations. (*Id.* ¶ 30.) Stone and Montgomery told Flanagan there was no room for promotion into a portfolio-management role on the North Shore, and Montgomery further advised Flanagan that, if he was at a point where he was ready to be promoted, there were plenty of opportunities in the role of investment advisor. (*Id.* ¶¶ 30-31.) After learning of Flanagan's conversations with Stone and Montgomery, Asher talked to Stone about whether he would need to transfer as well. (*Id.* ¶ 36.) Stone told Asher he could work in either role and that JPMC still needed employees like him, but that he "absolutely had the option to transfer." (*Id.* ¶¶ 36, 107.) In 2007, Flanagan decided to transfer to a position as an assistant to an investment advisor in the Wilmette office. (*Id.* ¶ 34.) Asher did not transfer. (*Id.* ¶ 37.) Although Flanagan continued to assist Asher, Mau, and Hunt, Flanagan's transfer left the three portfolio managers without full-time assistance for a period of time. (*Id.* ¶ 35.)

Michael Stoffregen was employed by JPMC (and JPMC's predecessors) as a portfolio manager from 1980 through October 2006. (*Id.* ¶ 120.) Stoffregen was terminated when he refused to sign a non-compete agreement without being offered additional consideration. (*Id.*) Stoffregen testified that he believed he was terminated because of his age. (*Id.*) He was fifty-two. (*See id.*)

## LEGAL STANDARD

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying the evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). If the moving party meets this burden, the nonmoving party cannot rest on conclusory pleadings but "must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 596 (7th Cir. 1995) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986)). A mere scintilla of evidence is not sufficient to oppose a motion for summary judgment; nor is a metaphysical doubt as to the material facts. *Robin v. Espo Eng. Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000) (citations omitted). Rather, the evidence must be such "that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica, Ind.*, 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

In considering a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005) (citing *Anderson*, 477 U.S. at 255). The court does not make credibility determinations or weigh conflicting evidence. *Id.*

## ANALYSIS

The ADEA prohibits employers from terminating employees over forty because of their age. *See* 29 U.S.C. §§ 623(a)(1), 631(a)(1). A plaintiff suing under the ADEA may show discrimination *directly* (through direct and circumstantial evidence that the challenged decision was motivated by age) or *indirectly* (through the burden-shifting approach set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). *Martino v. MCI Commc'ns Servs., Inc.*, 574 F.3d 447, 452 (7th Cir. 2009) (*Martino*). "In either case, the bottom-line question is whether the plaintiff has proved intentional discrimination . . . ." *Id.* (citing *Olson v. N. FS, Inc.*, 387 F.3d 632, 635 (7th Cir. 2004)). As Asher devotes most of his effort to the indirect method of proof, the Court begins there.

### The Indirect Method

To establish a *prima facie* case of age discrimination, Asher must show: (1) that he is over forty; (2) that his performance met JPMC's legitimate expectations; (3) that he was subject to an adverse employment action; and (4) that JPMC treated younger employees more favorably. *See Hartley v. Wis. Bell, Inc.*, 124 F.3d 887, 890 (7th Cir. 1997); *Taylor v. Canteen Corp.*, 69 F.3d 773, 779 (7th Cir. 1995) (*Taylor*). If Asher

10

establishes a *prima facie* case by establishing genuine issues of material fact as to these four elements, he creates a rebuttable presumption of age discrimination. *Taylor*, 69 F.3d at 779. JPMC would then have the burden to articulate a legitimate non-discriminatory reason for Asher's termination. *Id.* If JPMC can articulate such a reason, the burden shifts back to Asher to show that JPMC's proffered explanation is "merely a pretext for age discrimination." *Id.*

The parties do not dispute elements (1) and (3) of Asher's *prima facie* case. (*See* Def. Br. at 11 ("It is undisputed that at age fifty-eight, Plaintiff was a member of a protected class and that his discharge constitutes an adverse action.").) The second and fourth elements are in dispute.

JPMC claims Asher was not meeting JPMC's legitimate expectations because he attempted to forward confidential information to a client in violation of the Code. Asher does not deny doing so. (SOF ¶ 54.) Instead, he highlights his strong record of past performance and suggests the Court should bypass this element because Asher alleges JPMC applied its legitimate employment expectations in a discriminatory fashion favoring younger employees. (Pl. Br. at 7-8.)

If a plaintiff alleges that he has performed satisfactorily and that the employer is lying about the expectations required for the position, "the second prong and the pretext question seemingly merge because the issue is the same – whether the employer is lying." *Hague v. Thompson Distribution Co.*, 436 F.3d 816, 823 (7th Cir. 2006); *see also Curry v. Menard, Inc.*, 270 F.3d 473, 477 (7th Cir. 2001) (*Curry*) ("[W]here the issue is whether the plaintiff was singled out for discipline based on a prohibited factor, it 'makes

little sense . . . to discuss whether she was meeting her employer's reasonable expectations.'") (quoting *Flores v. Preferred Tech. Group*, 182 F.3d 512, 515 (7th Cir. 1999)).  Therefore, because Asher alleges he was terminated based on discriminatory application of an allegedly ambiguous provision in the Code (Pl. Br. 2-3), the second element of Asher's *prima facie* case merges with the analysis of whether JPMC's purported justification was actually pretext for a discriminatory motive.

To establish the fourth element of his *prima facie* case, Asher must show that younger, similarly situated employees received preferential treatment from JPMC.  He alleges there are two such employees who committed similar violations without rebuke: Raymond Mau and Christopher Flanagan.[4]  (*Id.* at 8-11.)

Although Mau and Flanagan are substantially younger than Asher – by seventeen and twenty-nine years, respectively – neither were similarly situated to Asher in terms of "performance, qualification and conduct."  *See Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000) (*Radue*) (citation omitted).  Normally a plaintiff must show that the younger employees "dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them."  *Id.* at 617-18 (citation omitted).  This requirement is very important, "for without it a plaintiff would only have to point to one younger employee who was treated better than he."  *Id.* at 619 (citation omitted).

Asher cannot show that Flanagan and Mau "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* at 617-18. The conduct relevant to Asher's case is the forwarding of written confidential information to a client, and there is no evidence that Flanagan or Mau engaged in conduct of comparable seriousness. *See Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 689 (7th Cir. 2007) ("[T]he critical question [as to misconduct] is whether they have engaged in conduct of comparable seriousness."); *see also Radue*, 219 F.3d at 619 (stating that "substantial similarity requires a showing that the ostensibly similar employees conducted themselves in a corresponding fashion") (citation omitted).

Although Asher argues that "Mau also disclosed analyst commentary to clients" (Pl. Br. at 9), Asher is merely relying on his own general allegations that other portfolio managers disclosed information verbally or presented it in modified form (Asher Dep. 87:9-23). Asher does not identify any documents showing that Mau (or any other employee) ever forwarded written analyst commentary to a client. Nor has he identified any testimony that Mau specifically sent written analyst commentary to a client. Mau himself testified that internal research and third-party research could *not* be sent to clients (Mau Dep. 55:18-23), and Asher does not dispute that Mau denies ever disclosing analyst commentary or research to clients (*id.* ¶ 65).

---

[4] Asher also claims Flanagan received preferential treatment when Flanagan was encouraged to transfer into another position. (Pl. Br. at 10-11.) But that is not the adverse action of which Asher complains. Any preferential treatment Flanagan received is more appropriately discussed in terms of pretext. This issue is discussed below.

Asher's allegations as to Flanagan fare no better. Asher attempts to support his *prima facie* case by noting that there is no evidence that Flanagan was ever disciplined for "engaging in this same activity for which Plaintiff was purportedly terminated." (Pl. Br. at 10.) But the burden to make a *prima facie* case is the plaintiff's and, again, Asher fails to provide any evidence that Flanagan emailed confidential analyst commentary to a client. In fact, Flanagan testified that he did not recall *ever* emailing a client. (Flanagan Dep. 59:3-4.) Without any evidence that Mau or Flanagan engaged in conduct corresponding to that for which Asher purportedly was terminated, Asher's *prima facie* case fails.

Furthermore, even if Asher were able to establish a *prima facie* case, he cannot show that JPMC's facially legitimate, non-discriminatory reason for Asher's termination was really a pretext for ageism. JPMC claims to have terminated Asher for one reason: Asher's attempt to send written, confidential JPMC information to a client in violation of the Code. (SOF ¶¶ 92, 93.) Asher does not dispute that his conduct violated the Code, and JPMC has never waivered as to the reason for Asher's termination. Both supervisors who made the decision to terminate Asher's employment testified they did so because of the Code violation, and the record clearly shows that Asher's actions received strong and immediate criticism from multiple levels of JPMC's management in addition to Stone and Montgomery. JPMC thus has offered a legitimate, non-discriminatory justification for terminating Asher's employment, which (if Asher had set forth a *prima facie* case) would shift the burden back to Asher to show that JPMC's proffered explanation was merely a pretext for firing him because of his age. This he cannot do.

14

Pretext can be shown by offering evidence that JPMC's "ostensible justification is 'unworthy of credence.'" *Testerman v. EDS Tech. Prods., Corp.*, 98 F.3d 297, 303 (7th Cir. 1996) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). Asher must point to evidence that JPMC's asserted justification was factually baseless, was not the actual motivation for the discharge, or was insufficient to motivate the discharge. *Id.* (citation omitted). The Court's only job is to assess whether JPMC's justifications for Asher's termination are honest. *Ballance v. City of Springfield*, 424 F.3d 614, 621 (7th Cir. 2005). The Court will not "sit as a super-personnel department with authority to review an employer's business decision as to whether someone should be fired or disciplined because of a work-rule violation." *Id.* (citing *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000)).

Asher fails to point to any evidence that his age (and not his violation of the JPMC Code) was the true reason for his termination or that JPMC's explanation of his termination is not credible. Asher attempts to do so by claiming younger, similarly situated employees were treated more favorably, that his supervisors actually encouraged the conduct for which he was terminated, and that JPMC's management has engaged in a pattern of age discrimination. But these allegations lack sufficient support for any reasonable jury to find that JPMC's purported justification was not credible.

JPMC's reason for terminating Asher was not baseless. Asher alleges confusion as to whether the analyst's email was research, but he admits that he violated the Code and that JPMC's policies permitted termination for such a violation. Asher does not dispute that providing certain information from analysts could constitute insider

trading, which could dramatically impact JPMC. (SOF ¶¶ 50-51.) Nor does he dispute that JPMC was greatly concerned that Asher's actions could have jeopardized portfolio managers' continued access to JPMC analyst research. (*Id.* ¶ 74.)

Instead, Asher alleges the policies he violated were "nebulous" and that Stone and Montgomery applied them in a confusing manner, even "encourag[ing]" portfolio managers to provide analyst commentary to clients and "systematically fail[ing] to follow the very policy they used to justify the termination of Asher's employment." (Pl. Br. at 2, 12-13.) Asher then cites authority for the proposition that "departures from established practices may evince discriminatory intent." (Pl. Br. at 13 (citing *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 727 (7th Cir. 2005); *Nabozny v. Podlesny*, 92 F.3d 446, 455 (7th Cir. 1996).) But in contrast to those cases, where *departure* from policy was probative of discrimination, Asher is alleging in this case that JPMC's *enforcement* of policy is probative of discrimination. Perhaps Asher argues in effect that JPMC departed from an unofficial policy of not enforcing the nondisclosure policy. But that is the same as arguing that JPMC enforced its policies in a discriminatory manner. And Asher has failed to cite a single incident where his supervisors were aware that an employee attempted to forward written analyst commentary to a client yet chose not to discipline that employee. *Contra Curry*, 270 F.3d at 479 (finding sufficient evidence of pretext when employer claimed it was enforcing uniform policy, but black employee was only person terminated while two non-black employees had not been disciplined).

Asher also claims evidence of pretext based upon "a reasonable inference . . . that Defendant purposefully attempted to lock Plaintiff into a position which was going to

be eliminated, while encouraging his younger comparative [Flanagan] to move to another position so that Flanagan would have a future with Defendant **while Plaintiff would be set up for termination down the road.**" (Pl. Br. at 14 (emphasis added).) Such an inference is not reasonable. First, regardless of which party more appropriately characterizes Flanagan's title and responsibilities, the evidence clearly shows that Flanagan *assisted* Asher, Mau, and Hunt. After being told there would not be an opportunity for him to move into a portfolio manager position (Asher's position), Flanagan decided to alter his path and serve as *an assistant* to an investment advisor instead. (SOF ¶ 34.) But Stone told Asher he "absolutely had the option" to transfer into an investment-advisor role as well. (*Id.* ¶ 36.) Furthermore, Asher fails to explain how his termination, which was based on a single incident, fits in with JPMC's alleged plan to set Asher up for failure or how Flanagan's transfer was related to Asher's email that led to his termination.

The evidence shows that at least three persons were involved in the decision to terminate Asher's employment and that multiple JPMC managers expressed disdain for Asher's conduct that allegedly resulted in his termination. In the face of such evidence, Asher's conspiracy theory cannot suffice to defeat summary judgment without more support. *See Wells v. Unisource Worldwide, Inc.*, 289 F.3d 1001, 1007 (7th Cir. 2002) (stating that the Seventh Circuit is "wary of allegations based on nothing but an attempt to come up with a conspiracy theory and in particular where there is not one scintilla of evidence in the record" to support such an allegation).

Moreover, Asher even suggests that JPMC "chose to make an example" out of him to clarify its policies. (Pl. Br. at 13.) Terminating an employee to clarify and enforce policies may not be fair, but it is not age discrimination. And the Court is not concerned "with whether the decision was right or wrong, fair or unfair, well considered or precipitous," only whether the reason actually did underlie the plaintiff's termination. *O'Connor v. DePaul Univ.*, 123 F.3d 665, 670 (7th Cir. 1997). Ultimately, Asher has failed to establish a genuine issue of material fact supporting his age-discrimination claim under the indirect method of proof.

*The Direct Method*

Although Asher presents his entire argument under the indirect-method-of-proof framework, he does cite case law relevant to a plaintiff's ability to defeat summary judgment with direct or circumstantial evidence of a discriminatory motive behind the adverse employment action. Direct evidence essentially requires an admission by the decision maker or eyewitness testimony as to the decision maker's mental processes showing that termination was based on a prohibited animus. *Radue*, 219 F.3d at 616 (citations omitted). In the absence of direct evidence, a plaintiff can attempt to show a "convincing mosaic" of circumstantial evidence that points directly to a discriminatory reason for the employer's action. *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994). The Seventh Circuit has recognized the following types of circumstantial evidence in discrimination cases: (1) evidence of suspicious timing, ambiguous statements, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might

18

be drawn; (2) evidence that younger, similarly situated employees received systematically better treatment; and (3) evidence that the employee was replaced by a younger, similarly situated person and that the employer's reason for doing so was a mere pretext for discrimination. *Id.* at 736 (citations omitted).

Asher has not identified any direct evidence showing that he was terminated because of his age. Nor has he developed a "convincing mosaic" of circumstantial evidence. First, there is nothing suspicious about the timing of Asher's termination. Within moments of attempting to send the prohibited email, Asher received censure from management. Within days, he was terminated. All of this occurred within weeks of Asher's attending a meeting where JPMC management discussed the proper treatment of confidential information.

Nor has Asher identified any ambiguous statements or comments directed at other persons over forty years old. The record appears to be completely devoid of evidence of any ageist comments. Asher claims JPMC's act of terminating Asher's employment is consistent with a pattern of age discrimination amongst JPMC's decision makers, and he identifies two alleged victims of this discriminatory pattern: Michael Stoffregen and Howard Hunt. (Pl. Br. at 14.) But neither employee's departure permits the conclusion that JPMC has engaged in a pattern of age discrimination.

JPMC terminated Stoffregen in October 2006 purportedly for refusing to sign a non-compete agreement without consideration. (SOF ¶ 120.) Stoffregen, who was fifty-two at the time, believes he was terminated because of his age. (*Id.*) But Stoffregen's testimony reveals that his belief was based on "simple cost savings" because he was

"expensive to have around." (Stoffregen Dep. 25:11-21.) So even if Stoffregen is correct, his termination would not alone be indicative of age discrimination. The Supreme Court has clarified that terminating an employee based on a factor that is empirically correlated with age, such as salary, does not violate the ADEA where age was not the actual motivating factor. *See Hazen Paper Co. v. Biggins*, 507 U.S. 604, 611-12 (1993). At any rate, Stoffregen's subjective belief that JPMC discriminated against him six months before Asher's termination for an entirely unrelated reason does not indicate a pattern of age discrimination by JPMC.

Nor is Hunt's termination indicative of a discriminatory pattern. As discussed above, Hunt was another portfolio manager who, along with Mau, received the bulk of Asher's accounts after Asher was terminated. He was fifty-seven at the time. Hunt's employment with JPMC ended on June 12, 2009, when Hunt was fifty-nine. Asher claims JPMC's purported reason for terminating Hunt was the elimination of Hunt's department (Pl. Br. at 14), while JPMC asserts that Hunt opted to take a severance in lieu of transferring to Columbus (SOF ¶ 119). Hunt admitted taking a severance but claims his employment ended due to lack of work and that JPMC told him it was because his department was being eliminated. (Hunt Dep. 8:14-9:20.) Construing all inferences in Asher's favor, the Court finds it reasonable to infer that Hunt was terminated due to lack of work and the elimination of his department. But this finding does not vindicate Asher. Hunt's termination occurred in June 2009 – over two years after Asher was terminated – and Asher has not identified any evidence connecting the two events.

Asher's cited authority does not help his cause. In *Titus v. Elgin, Joliet & Eastern, Railway Company of Indiana a/k/a EJ&E Railroad*, No. 2:01-CV-424ps, 2005 U.S. Dist. LEXIS 12096, at *15 (N.D. Ind. June 16, 2005) (*Titus*), there was evidence that the defendant was selectively enforcing a no-sleeping rule to discriminate against black workers. Only two employees were disciplined for sleeping on the job – both black. *Id.* at *13-14. And there was evidence that the same supervisor opted not to discipline a white employee who also was caught sleeping on the job. *Id.* In *Sylvestor v. SOS Children's Villages Illinois, Inc.*, 453 F.3d 900, 904-905 (7th Cir. 2006) (*Sylvestor*), the court found sufficient evidence of retaliation when two of four signatories to a sexual-harassment complaint were terminated within ten days. In contrast to the plaintiffs in *Titus* and *Sylvestor*, Asher has not shown any connection between Hunt's and Stoffregen's departures and his own. Terminating three portfolio managers (counting Asher) for three separate reasons over the course of two-and-a-half years hardly indicates a practice of discriminating against older workers simply because each employee was in his fifties.

There also is no evidence that any younger, similarly situated employees received systematically better treatment or that Asher was replaced by a younger similarly situated worker. Flanagan clearly did not replace Asher; he transferred to another group before Asher's termination. As to Mau, the parties disagree as to whether his receipt of half of Asher's accounts after Asher's termination constitutes a replacement. But this question need not be resolved because, as discussed above, Mau

was not a similarly situated employee – he was never caught trying to send written confidential information to a client.

Ultimately, Asher does not demonstrate a "convincing mosaic" of circumstantial evidence of age discrimination. Asher violated a policy. He was terminated shortly thereafter, and JPMC cited that violation as the sole reason. No one else was caught committing this same offense. JPMC's reaction may have been harsh, but that is not the Court's concern. To prevail on an ADEA case, the plaintiff must prove that, "but for his age, the adverse action would not have occurred." *Martino*, 574 F.3d at 455 (citing *Gross v. FBL Fin. Svcs.*, ___ U.S. ___, 129 S. Ct. 2343 (2009)). Asher has not demonstrated that he reasonably could make that proof at trial, and summary judgment must therefore be granted in JPMC's favor.

### *Fees and Costs*

The Court now turns to JPMC's request for fees and costs. JPMC requests fees and costs in its motion but offers no explanation as to why such an award is justified in this case. The Seventh Circuit has stated that the ADEA permits an award of attorney's fees to a prevailing defendant only if the plaintiff's allegations were made in bad faith. *E.E.O.C. v. O & G Spring & Wire Forms Specialty Co.*, 38 F.3d 872, 883-84 (7th Cir. 1994). But JPMC has not alleged bad faith, and the Court will not undertake the analysis on its own. JPMC's request for an award of attorney's fees is denied.

On the other hand, reasonable costs "should be allowed to the prevailing party" as a general matter of course following a judgment. Fed. R. Civ. P. 54(d)(1). JPMC may submit a bill of costs in accordance with 28 U.S.C. § 1920 and N.D. Ill. Local Rule 54.1.

Itemized costs will be taxed in favor of JPMC if the Court finds such costs to be both reasonable and recoverable. *See Majeske v. City of Chicago*, 218 F.3d 816, 824 (7th Cir. 2000).

## CONCLUSION

For the reasons stated above, JPMC's Motion for Summary Judgment is granted as to Asher's sole claim of discrimination under the ADEA. JPMC's request for attorney's fees is denied. As to its request for costs, JPMC may present a bill of costs in accordance with the parameters set forth in 28 U.S.C. § 1920 and N.D. Ill. Local Rule 54.1 within fourteen days of this Order.

Date: November 18, 2009

JOHN W. DARRAH
United States District Court Judge